Good morning and happy Friday. Welcome to the 11th Circuit. I know you've all been reminded about our timing system for oral arguments. When the light turns yellow, you'll have two minutes remaining in your allotted time, and when it turns red, please quickly conclude your remarks, the exception being if you're answering a question from the court, you may conclude your answer. So we will get right to it. Our first case of the morning is number 2313253, Eric Andre v. Clayton County, Georgia. Mr. Friedman. Good morning, Your Honors. May it please the Court. My name is Barry Friedman, and I'm representing the plaintiff appellants in this case, Mr. Andre and Mr. English. The complaint in this case, Fairly Red, describes a longstanding program operated by a specialized unit of the Clayton County Police Department in which officers follow a protocol in which they stop individuals proceeding down the jet bridge to their planes and question them. And the complaint in this court, in this case, Fairly Red, describes causes of actions on behalf of Mr. Andre and Mr. English. First, that the stops were racially motivated in violation of the Equal Protection Clause. And second, that those stops constituted seizures within the meaning of the Fourth Amendment. Nonetheless, the district court dismissed this complaint prematurely, failing to apply the facts as alleged in the complaint as true and all reasonable inferences and doubts in our favor. In failing to apply settled, correct law, the court dismissed the complaint, and we I'm going to begin with the seizure issue. Under the facts alleged in this complaint, in this court's correct settled law, a seizure was stated. In this case, my clients, who had passed through TSA security, the elaborate security procedures, had gone to the gate, proffered their information yet again, their tickets, and then headed down the jet bridge when officers of Clayton County stepped in front of them, obstructed or blocked their paths. They moved Mr. English to the side of the jet bridge. The officers positioned themselves so that he was effectively blocked from moving to the plane. They took their identification and their tickets, their boarding passes. They peppered them with questions about whether they were carrying illegal narcotics, why they were traveling, where they were traveling, what their professions were. And then at the very end of that encounter, the officers told each at the end of the encounter, you are free to leave. So looking at the Berry factors, which you have just listed, how those factors apply to your case, as far as the retention of the identification and the boarding passes, Berry says it could be a concern and might relate to a seizure if the officers have retained the boarding pass and identification for more than a minimal amount of time. As I have read the complaint, there's no suggestion of how long the officers retained the boarding pass and the identification in each of these two cases. How should we evaluate that factor as it applies to your case? Sure, Your Honor. So in this Court's airport seizure cases, a minimal amount of time is actually a bit of a term of art. So if one looks at the cases, they really divide into two categories. There's the categories in which officers come up and all of the cases cited by the District Court and our friends on the other side, ask if they may speak with somebody, ask for their ticket, glance at it momentarily, just as I assume consistent with the drug courier cases to look and see if the ticket matches the identification, hand them back. And then if there's any questioning, it happens after that. Are you suggesting that in any circumstance where the officer retains the boarding pass and the identification during the entirety of the questioning, that's more than a minimal amount of time and that's what happened in these cases? Yes, Your Honor. That is exactly what this Court's cases say. They say it in Thompson. They say it in Ossoffer. They say it in Shumley. All the cases that we cite and that really are not discussed in the District Court decision say precisely that. Another one of the factors is that our cases seem to emphasize that whether a seizure occurred depends in part on whether the officer's questioning specifically suggested that the passenger was suspected of carrying drugs. How should we think about that in light of your case because the officers did not make the statement that they were suspected of carrying drugs? That's true, Your Honor. They did step in front of our clients and instantly start asking whether they were carrying a litany of illegal narcotics, which would lead one to wonder why it was that they were singled out, which is what they were, for that to happen. So I think in that situation, you know, to look at the Barry factors, and Barry factors have, of course, been applied for this Court throughout all the airport cases, but then much beyond that, they start with the three factors that the Court thinks are the most coercive in this situation because the test is whether a reasonable person would feel free to go, and those tests start with, was your way blocked, which only makes sense because if your path was blocked, then you can't go where you're going, and all the way back to Blackstone, as cited in the amicus brief from Cato, that is, in fact, a restraint on one's liberty. Then it moves to the fact that your identification has been taken. Just to go back to Your Honor's question, the reason that matters is because in airports, people ask us for identification in our boarding passes all the time. We hand them over. They hand them back. But if you are, in fact, going somewhere and your license or your ticket is being held, in fact, today, of course, many of us have our boarding passes on our phones, which might mean that you're holding somebody's phone, you just can't get up and go. And so that distinction between quickly looking and then handing them back and holding them throughout the encounter actually matters, I think, a great deal. So you're pointing throughout your briefing, and we're talking about this today, the Barry Can the law that applies to this case really be clearly established for qualified immunity purposes if, in each case, we're having to consider some factors to see if there was a constitutional violation? So, Your Honor, under a totality test, I assume one could take the position that there could never be an officer could never step past qualified immunity because it's a complex of factors. But, again, as I've suggested, if one divides the cases into Elsifer and Thompson and Shumley and cases like that, and on the other hand, the cases like Armstrong and Pugliese and Jensen, there really is a very clear line. It's been that line for 40 years now that if you retain the documents, that and you block somebody's path, that is, in fact, a seizure. And, in fact, if you read the many airport stop cases and look at, for example, the very he was always careful, as was true in virtually all the other cases that I've read, to come up and say, can I talk with you, or to stand to the side of somebody and not block their path. And it's when the officers block somebody's path and take their documents and hold on to them that we, in fact, have a problem. Can you help me with the standard for what is more than a minimal amount of time? Is that more than five minutes, ten minutes? How do you articulate that? Your Honor, I think, again, in the cases, that is a term of art. So if the officer takes the documents, glances at them, hands them back, then that's a minimal amount of time. And if the officer holds them throughout a It's not time at all. It's about what the conduct is in the amount of time. Precisely, Your Honor. Under the cases In these cases, you would acknowledge that, let's say, the first case, it was ten minutes. In the second case, it was under ten minutes. In the second case, it was under five minutes because there was no search. Right. It was five minutes in the second case. That's correct, Your Honor. I'm just trying to understand what we do with more than a minimal amount of time in an opinion. So in the second case, it was under five. In the first case, under ten. Would that be fair? Or what should we do with it? We don't have a specific amount of time in the first case. In the second, it was five minutes. You got alleged in the complaint. I was seized. So kind of taking the complaint as a whole, here's what the questions were. What is your approximate time on the first part? It could have been ten minutes or fifteen minutes. But I want to stress to the court that in the cases I understand, Your Honor, what the conduct is as opposed to the pan and blocking thing. But we still need to know the amount of time. I need to know in the last favor of your client on a motion to dismiss, what is the amount of time? You said under ten to fifteen minutes in the first one. That's probably true, Your Honor. Actually, you have in the record and a link in the complaint and in the brief to the search of Mr. Ely. And you can see on the video he took because he took that video to show that, in fact, he was the only black person who was being searched. And you can kind of get a sense of what the interaction looks like from looking at that video where the officers are taken. I'm just trying to know how you say the amount of time. I understand, Your Honor. Five minutes for the second case and under ten to fifteen approximately for the first. Yeah, I think it was five in the second case. And I'm willing to guess with you, Your Honor. But we are guessing and stepping past. I want to say from the totality of the allegations in the complaint because you allege what happened. You said he was stopped, they asked him questions, they took the bag. So what does that tell me? What would you say that implies? Well, it implies that they held the documents throughout the entire encounter. What about the time? I'm talking about the time. Your Honor, I don't know the time. I'm willing to surmise with the Court that it was under fifteen minutes, but I don't know. All right. If I can turn to the equal protection claim in this case. Let me ask you one more question. You emphasized the fact that the officers were on either side of Mr. English. And your argument is that because they're in this narrow jet bridge, their way is obstructed perhaps more than it would be if you were at the ticketing counter or you were at the departure gate. But what do we do with the bus case and the factory case where the exits were blocked and so people couldn't leave and yet the Court said that that's not a seizure? Your Honor, actually, you know, the District Court cites the Drayton case, one of the bus cases, and says that the way was blocked. But when you read Drayton, the Court says three times that the way was not blocked, that the exits were, in fact, open, that the aisle was not blocked. And I think that's the case. And in Delgado, what the Court says is that there were officers standing at the exits. There was no indication that people could not leave. They might be questioned on their way out. But most people were working in the factory, so they weren't going anywhere. And, in fact, it is pervasively true in all of the cases I have seen that if the way is actually blocked, that is, in fact, a seizure. That's sort of the classic definition of a seizure. And are you making an argument, because this seems to be kind of the tenor of the complaint, that because the plaintiffs went through security, already shown their tickets to the gate agent, et cetera, that they could not be searched after that point once they were in the jet bridge? I mean that they could not be stopped? Yes, Your Honor. They could certainly be stopped. People could be stopped at any moment, but the question is whether there was suspicion to stop them or not. And then if there's not suspicion, then the officers can't engage in conduct that constitutes a seizure. That's kind of the black letter law about that. If I could turn to the equal protection argument, Your Honor, I think the key word in this situation is random, which is that we have alleged and the defendants, the officers have told people and the defendants on page three of their briefs say that these seizures were random. And yet we can tell from the evidence that we have that they were not, but that they were racially motivated. I'm on equal protection.  Sorry, Your Honor. Yes. We're going to equal protection. Right. And the claim is that these were random stops, but in fact they were not. They were racially motivated. We have facts in the record to show that two of the individuals who were stopped, Mr. Andre and Mr. Ely, pointed out that they were the only black individuals in sight. But more important than that, we have statistical evidence that is overpowering in this case. So I'm seeing in your amended complaint where you specifically allege that discriminatory intent on the part of the individual officers. You can either correct me if I'm wrong. If I'm not, is that, does that doom your equal protection claim as to the individual officers? I don't think so, Your Honor, because those officers who are recording these stops in a log that they keep are perfectly well aware of the race of people they are stopping, and they can see that there's a line of white people and they're stopping the person who's black. And so they're aware since, I mean, it's been the law in this circuit for many decades that, of course, intentional racial discrimination is unconstitutional, and they're actually on the ground aware of the people that they're stopping. And so that is the basis for them being liable. But do you have any allegations in the, because the officers, well, I'm sorry, let me back up. The officers in both of these two cases are different. So presumably we have officers throughout the airport conducting these jet bridge stops. So in this, looking at the officers involved in one case that you have brought and then looking at the other situation that you have brought, do you have any, you don't have any allegation that they were, that there was any discriminatory intent on their part? And we don't have any information that suggests that those individual officers were, in fact, stopping more black passengers than white passengers. You're looking at overall statistics, correct? Yes, Your Honor, but in the logs it's a very tiny number of officers. I believe it's four. And they are, in fact, stopping 56% of the people that they stop are black, even though, as we've alleged, the number of black individuals in the airport are 8%. And so they are perfectly aware that there's this dramatic disparity, one that, as we say in the complaint, there's less than 1 in 100 trillion chance that that could, in fact, not be motivated by race. Let me ask you a question now on the equal protection side as to Clayton County. Does it fatal the fact that in your complaint you do not allege that Clayton County implemented this program because of the disproportionate effect on black passengers? What we need to show, Your Honor, is that the stopping is happening because of and not in spite of race, and that we most definitely do allege. We say that these stops are racially motivated, that it couldn't, it would be highly improbable that it would be anything other than racial motivation. And so the district court does say, and the counsel on the other side will mention, that, in fact, the officers were never instructed to stop people on the basis of race. But that instruction is not what we have to show. We simply have to show that the county was aware. In fact, as your decision in Greater Birmingham Ministries points out, that there was foreseeability that there could be a problem, that there was knowledge that there could be a problem, that there was a problem, and that there were alternatives. And in this case, every week they get logs that show pretty evenly throughout them that 56 percent of the people being stopped are black. And you can see on the logs, it's black male, black male, black male, white woman, black male, that that's, in fact, what's going on. Let me ask you just one quick question about the logs. It's not in your record as far as I can tell. The logs you have indicated indicate the race at the passenger stop. Does it indicate the flight? Yes, it does, Your Honor. So it tells us what, where the flights are headed. Sure. I know there's some confusion because the briefs from the appellees say only Los Angeles. The district court says California. That's clearly true because Preston Lewis was stopped going to San Francisco. But the logs show they were headed to Kansas City, to Denver, to Charlotte, to Portland. There were, I think, ten jurisdictions that they were headed to. And we allege in paragraph 61 and 62 that this is happening on domestic flights in the Atlanta airport, which is, in fact, true. The district court narrowed it down as an Atlanta to California flight. So that was the basis of my question. Right. And that's inconsistent with what the logs show. I have a red light. I have time. I'm not sure which one I'm supposed to follow. Are you done with me? Am I done? Okay. Good morning. May it please the Court. Alyssa Haynes for Clayton County and the individual officers. Appellants are the masters of their complaint. And they have had two opportunities in this case, the first complaint and the amended complaint, to plausibly state an allegation for claims of Fourth and Fourteenth Amendment violations, and they have failed to do so. The district court should affirm the district court's holding, starting with the individual officer claims as to the Fourth Amendment. Both this court and the United States Supreme Court have held that a police officer does not seize somebody simply by questioning them, even asking about specific drugs they're carrying, and asking for identification and consent to a search. And importantly, this is true regardless of where that encounter takes place, be it a street, be it the concourse of an airport, be it on a bus, or be it in the narrow confines of a jet bridge. Because as the Supreme Court recognized in Bostick, bus passengers, for example, simply by choosing to take the bus, in essence, narrowly restrict their own movement by choosing to take the bus that day. So you dispute that in looking at the very factors in this case, that the officers were blocking the plane's path? I do, Your Honor. There is no allegation in the complaint that the door to the airplane was blocked or that the appellants in this case could not have gone around the officers and simply boarded the airplane. So in an airport environment, Yes, Your Honor. would any passenger who is stopped by a TSA, a police officer, know that they're free to leave unless they're told? Well, if we're looking at the very factors, I believe so, Your Honor. And the fact that it's in both the court in Bostick and the court in Drayton emphasize that the fact that we are in a confined space, or regardless of the nature of the setting or what part of society we're in today, it still stands that that says nothing about the coercive nature of the stop. What if it had been a TSA agent on the jet bridge? Would it have been stopping passengers like this? Would a passenger be free to leave until the TSA agent said you're free to leave? Well, you do not have to. This case law specifically states in Bustamante that you do not have to tell the individual that they are free to leave if they are free to terminate the encounter. If TSA stops you for a secondary or tertiary screening on the jet bridge, is any passenger free to say, I'm not participating in this screening, I'm continuing on to the plane? On the jet bridge, absolutely, Your Honor. And there was no indication. Can you walk away from a TSA agent who says, I have pulled you aside for TSA screening? I think there are specific statutes that apply for TSA particularly, but this case did not involve TSA officers. This involved Clayton County police officers and investigators that simply showed their badges and asked the individuals a series of questions. And I believe you had, as far as the restriction of movement, the case so heavily relied on by the appellants in the Berry case actually used language, and I'll quote, we note that the agent stopped Berry's progress towards a taxi stand and still find no evidence of coercion on the record. So in my comparison to TSA, I shouldn't be comparing to TSA is what you're saying? I do not believe so, Your Honor. So why in your brief on page 17 do you say this is factually comparable and no more intrusive than the time required by travelers to submit to additional X-ray screening or a pat-down by a TSA agent? From a timing perspective, Your Honor, the brief nature of the encounter itself. Your Honor, I believe Your Honor also mentioned the holding on to the ticket if we go through the Berry factors. And as opposing counsel said, there is no standard on that. There is no specific time. And as this Court held in De La Rosa and as this Court held in United States v. Armstrong, stopping individuals while holding on to their identifications or holding on to their boarding passes and specifically asking questions about whether they were carrying drugs was insufficient to amount to a seizure in those cases. Now, as far as the search in Mr. English's case, that too, there is no evidence in the complaint that that was coerced and appellants rely on the cases of Chemily and Becca Beltran. But in both of those cases also, A, those were Border Patrol cases, and B, in each of those cases there was evidence that the individuals were suspected of specific crimes or in one case I believe the officer told them specifically that they were alleged of – that they were being stopped because they fit the drug courier profile. Do you concede that if we find that Mr. English was seized, the case of the search was tainted? No. Even if there was a seizure, Your Honor, I believe the consent to search was voluntary in this case. How so? Because, again, we can apply the totality of the circumstances and, you know, just like they don't have to tell somebody they have the consent to search. We have Mr. English's age, intelligence. The complaint states that he is an internationally celebrated stand-up comedian, actor and writer. There was nothing to allege that there was any coercive manner. The complaint specifically states that he was cooperative in that encounter and there was no allegation that Mr. English believed that any incriminating evidence would be found. So I do believe the consent to search would still be valid in that case. What about Mr. Friedman's argument that if someone has your identification documents, your boarding pass, as well as a lock on your name, how are you going to be free to leave to get on that plane? I believe, Your Honor, I believe the cases they cite to for that would be Elsifer and Thompson. And in each of those cases, they involve situations where the specific identification that's being reheld made it to where the reasonable person would not feel free to leave the encounter. And I know that sounds confusing, but what I mean by that is, so, for example, in Elsifer, they held on to a ticket while asking for further questions. But in that case, the stop was in the concourse of the airport. The individual had not yet shown his ticket to board the plane. The individual needed that ticket in order to proceed on the plane. In this case, the appellants had already scanned their boarding passes, they had already shown their driver's license, and they were in the jet bridge of the airplane. There would have been nothing to prevent them from physically boarding the airplane despite the fact that at the time, the officers had the individual boarding pass in hand and the driver's license. And the same in Thompson. That involved an auto stop, and the individuals kept the driver's license while they were questioning. And in that case, the Court found that there was a seizure because no one, no reasonable person would feel free to leave and drive away without a license because then, in turn, they would be committing the crime of driving without a license. But they're free to leave the stop and get on the plane without a license? Yes, Your Honor. There's nothing that they – sure, it's not convenient. They don't – they probably do not want to leave their driver's license, but there would be nothing. They don't want to fly home? If this was a trip to California and fly back, and that's their ID, they can't get back on a plane. But we're talking about flying there. They're flying to where they are going, and they are able to get on the plane without their identifications. Also, the individual officers, as Your Honor mentioned, they would be entitled to qualified immunity in this case as to the Fourth Amendment because there is no clearly established law. United States v. Berry is not a material similar case that would have placed every officer on notice that their actions were offending the Constitution. Again, Berry merely provided us with totality of circumstances and factors to consider. And again, there are also similar cases where this Court has found no seizure, like Armstrong, Puglisly, and Jensen. Again, if you look to the individual officers and what is alleged in the complaint, sure, there are tons of statistics sparse throughout the complaint, but there is no allegation in the complaint as to the individual officers' actions and what they did. They say nothing at all about the individual actions. And that is not sufficient. You know, I think there's some broad allegations in there that just defendants collectively act a certain way or defendants collectively violate the Fourth Amendment or the Fourteenth Amendment, but that's not specific to the individual officers, and they have to allege something specific as to the officers. And as this Court stated, they also failed to allege, for example, a similarly situated comparator. There's no allegations anywhere in the complaint or anywhere in the statistics that they assert throughout the complaint as to how the officers treated similarly situated individuals of a different race. So in this case, that similarly situated comparator would be white individuals boarding flights that are subject to the interdiction program. And as this Court noted in United States v. Cannon, and I'm going to quote, statistical data reflecting the treatment of only one particular group cannot satisfy the discriminatory effect prong because it fails to state how the similarly situated persons were treated differently. So again, if we're looking to the claims against the officers, there's no statistics, no allegations that they did anything or how they treated white passengers who were boarding those flights. Similarly, if we look to the Fourteenth Amendment claims, the qualified immunity would apply there, too, because likewise, there is no clearly established law which would put every officer on notice that their conduct unequivocally violates the Equal Protection Clause. I believe the appellant's cite to Castaneda for this established law and discrimination in grand jury selection. But again, those statistics are much different than what we have here. And I believe the district court said that the statistical data was insufficient to show discriminatory purpose, but there were allegations in the complaint that the airport interdiction program is motivated by discriminatory purpose and that the officers conducting the jet bridge interdiction program select their targets based on race. Why isn't that enough to show discriminatory intent? Those are nothing more than conclusory allegations, which the court in Iqbal said is insufficient, merely stating that they acted with a discriminatory purpose and intent. It's the same thing as was the issue in Iqbal, simply stating that something violates the Constitution or laying out the elements of what amounts to an Equal Protection Claim. They have to do more. ...of the passengers that they apparently get weekly, so they know. The statistics that they cite to simply state, and I believe the district court did a good job of this in their 52-page opinion, where they state the problems with those statistics. They do not plausibly allege the general population. I believe, and I'm sorry, let me get back to my notes here. The issue with that is that they fail to allege the racial breakdown of the passenger's boarding, the unspecified flight subject to the interdiction program. Just because there's simply more whites or more blacks that are stopped than whites does not prove an Equal Protection Claim. I mean, if you were an officer and you were receiving a report saying, here's the statistics from this program or here's the logbook, 56 percent of individuals were African Americans who were stopped, that would not be something where somebody would stop and say, our program is discriminatory in nature or there is a discriminatory impact or discriminatory motive here. That's not alleged in the complaint. And, again, that's on page 39 of the district court's record where they go through each of the issues that are present with the statistics that are cited in the complaint. Should we be focused only on the flights to and from California? Yes, I believe that would be similarly situated. And the flights that they have alleged, again, they simply state. I mean, yes, I believe there's nothing that states anything else aside from that. Yes, well, so they're stating, I believe, a similarly situated comparator would be someone subject to the interdiction program. The complaint, though, says nothing about where the program applies or if it's just applying to flights to L.A. But I believe for this Court's consideration, we're simply looking at how individuals on the flights from California or from Atlanta to California are treated. Is the statistic given about how many people fly, is that a national statistic or an Atlanta to California statistic? In their complaint, Your Honor? In the complaint, I believe it says that 8% of the total, they say that 8% of the domestic air population in general are African Americans. And then they claim that the Atlanta airport accurately represents the general population. But again, from a qualified immunity standpoint, we don't have a similarly situated case that states anything about, again, what the officers are doing. And we don't have a discriminatory effect and we don't have a discriminatory purpose in this case. Unless Your Honors have any other questions. I'm not sure what is necessarily relevant at all, but I couldn't tell from the record to the extent I looked at it whether these were white officers or the race of officers. Does the record tell me? I don't want you to tell me what they are. I want you to tell me what the record tells me. You've got four separate officers here. You have two in the first incident and you have two in the second. Is that right? Just the number. The record doesn't tell us the race of any of the four officers. The record does not state the race of any of the individual officers, Your Honor.  Because the complaint failed to plausibly state a claim under the Fourth Amendment for an unlawful search and seizure and because the allegations in the amended complaint failed to plausibly state a claim against equal protection, there is no constitutional violation and therefore there is no liability on the county as well. And we would request this Court affirm the District Court's ruling in this case. Thank you. On the Court's time before you start the clock, is she right the record doesn't tell us the race of you didn't allege any race or anything about that in the complaint so we don't know from the record the race of any of the four officers. Is that correct? That's correct. That's correct, Your Honor. If you look at Mr. Ely's video, though, you can see the race of the officers in that video. Your Honors, I had not expected to start by pointing out that there's a dispute in the facts because we're here on a motion to dismiss and all the facts need to be taken in our favor. But this is precisely why we need discovery in this case. So co-counsel said that there was no allegations that their path had been blocked, but paragraphs 31, 36, and 51 say exactly that. We're told that these are only flights to California, but we know for a fact that that is not true. We're told that there are no comparators, but in fact, as the empirical scholars point out, precisely because these stops are random, We're told they're only California, but you know that's not true. Is that from the logs? That's from the logs that we were provided. Is that evidence or is that just the allegations in the logs? It's just a fact in the logs. And I bring it up only, Your Honor, because the defendants say only the facts in the logs. Are the logs in the record? No, they're not, Your Honor. Okay, so where do I get that from? Our allegation, which... Where the flights are to in the logs. Sure, thank you, Your Honor. Actually, it's important because Code Counsel said that we hadn't alleged it was anything but California, but in paragraphs 61 and 62 of the complaint, we say that this is happening in the Atlanta airport on domestic flights. We hadn't expected to then rebut something we never said, which is it was just Los Angeles or just California because we knew that not to be true. I do want to just also... The allegations are about all flights, all domestic flights. Yes, that's correct, Your Honor. That's absolutely correct. And similarly, on the comparator point, there are thousands of comparators. Because it's random, as the empirical scholars pointed out, this is happening. Anybody could be chosen getting on those flights. I want to make a point about time, Your Honor, and also point to our law enforcement officials who filed an amicus brief in this case. I'm happy to agree that it was less than 15 minutes if that's... if that is what is necessary. But the law is about conduct. So as our co-counsel pointed out, you know, you can't get through TSA in five minutes. I have, for sure. But that's unequivocally a search and a seizure. There's no doubt about that. The cases say that. What matters is the conduct under the totality of the circumstances. Thank you, Your Honor.